IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

CURT R. THEGE,

                    Plaintiff,

vs.

BNSF RAILWAY COMPANY, a
Delaware corporation,

                    Defendant.

4:20-CV-3014

MEMORANDUM AND ORDER

The plaintiff, Curt R. Thege, alleged in his complaint, claims concerning personal injuries sustained in an accident occurring in the course and scope of his employment with the defendant, BNSF Railway Company. Filing 1. The plaintiff has filed two motions for partial summary judgment pursuant to Fed. R. Civ. P. 56. The first seeks an order from the Court finding that the defendant breached its nondelegable duty of care owed to the plaintiff as a matter of law. Filing 97. The second seeks an order dismissing the defendant's affirmative defense allegations that the plaintiff was solely or contributorily negligent for causing his accident and injuries. Filing 100. For the reasons that follow, the Court will deny the plaintiff's motion regarding breach of duty, and grant his motion regarding the defendant's affirmative defenses.

## I. STANDARD OF REVIEW

Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts. *Torgerson*

*v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the evidence are jury functions, not those of a judge. *Id*. But the nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts. *Id*. In order to show that disputed facts are material, the party opposing summary judgment must cite to the relevant substantive law in identifying facts that might affect the outcome of the suit. *Quinn v. St. Louis County*, 653 F.3d 745, 751 (8th Cir. 2011). The mere existence of a scintilla of evidence in support of the nonmovant's position will be insufficient; there must be evidence on which the jury could conceivably find for the nonmovant. *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 791-92 (8th Cir. 2011). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Torgerson*, 643 F.3d at 1042.

## II. BACKGROUND

The plaintiff began his employment with the defendant on June 5, 2006, when he was hired as an apprentice carman. Filing 99-2 at 21-22. After successfully completing his 718-day apprenticeship period, he became a journeyman carman. The plaintiff spent his entire career with the defendant repairing damaged and wrecked railcars at the Havelock Shop in Lincoln, Nebraska. Filing 99-2 at 22. He loved his job, and got a great deal of satisfaction doing it. The plaintiff's supervisor, Jon Sinner, was asked to describe the plaintiff as an employee. Sinner answered, "Top-notch." When asked why, Sinner said, "Because he is. It's obvious." Filing 99-19 at 9.

In repairing a damaged railcar, carmen at the Havelock shop worked in teams of two. The plaintiff's partner for approximately a year before his accident and injury was Gage Dorr. Dorr was an experienced carman whose

employment with the defendant began on October 10, 2010, and like the plaintiff, went through the defendant's apprenticeship program in order to earn his journeyman status. Filing 99-3 at 5. Dorr and the plaintiff were assigned to work in what was identified as "the bay"—which had three separate workstations each manned by a team of two. Filing 99-3 at 27.

The day of the plaintiff's accident, June 11, 2019, Dorr and the plaintiff's shift started at 7:00 a.m. with a safety briefing and a discussion of the work scheduled for the day, which was followed by some stretching exercises. Morning briefings were usually led by Sinner or Gail Raddatz, who was described as the lead person. After the briefing, a damaged C6 hopper car was pulled into the bay for the plaintiff and Dorr to repair. Filing 99-2 at 28. They hooked the car up to the two overhead cranes—designated as the east bay and west bay cranes—to lift and move the car onto jack stands in the west bay. Dorr operated the west crane, and the plaintiff operated the east crane. Filing 99-2 at 40. Once the damaged hopper car was securely on the jack stands, the crane riggings were removed and the plaintiff and Dorr walked around the car to determine the repairs that needed to be made. They then gave Sinner their assessment of what needed to be done, and obtained his approval to make the repairs. Filing 99-2 at 28.

After their noon lunch break, Dorr and the plaintiff began the process of removing damaged side sheet panels from the end of the car where Dorr had been working. Filing 99-2 at 29; filing 99-3 at 14. Dorr began the process by removing a starter sheet, which is smaller than a full sheet. Dorr cut around the bottom and sides of the starter sheet with either a torch or plasma cutter. In order to access the top of a panel, Dorr stood on a scissor lift—a rectangular platform that could be mechanically raised and lowered. Dorr's lift was positioned in front of, and parallel to, the starter sheet and railcar. With his

scissor lift in position and raised, Dorr now had to access the top of the starter sheet panel so that he could cut just under the top cord of the railcar, but leave two, six-inch sections of the starter sheet attached to the top cord of the car so that the panel wouldn't fall to the floor. Dorr also cut a triangle-shaped hole near the top center of the panel. The west bay overhead crane was then moved directly over the starter sheet and the crane hoist was lowered so that Dorr could guide a hook on the chain that was attached to the crane's hoist into the triangular opening.

Aaron Myers was operating the crane's remote control that day. Filing 99-3 at 14. Myers and his partner, Ben Zurcher, had been working across from Dorr and the plaintiff that day, and after lunch, they had finished their car so they crossed over to help Dorr and the plaintiff with their car. Filing 99-4 at 18-19. After Dorr guided the hook into the triangular opening, Myers raised the crane's hoist just enough to take the slack out of the chain. The plaintiff, who was standing on his scissor lift, which was also positioned parallel to and in front of the railcar, cut the two, six-inch segments of the starter sheet still attached to the top cord of the railcar with a plasma cutter. This freed the starter sheet and allowed its full weight to fall onto the hook and crane hoist. Filing 99-2 at 40. Myers then lowered the started sheet down to the floor where it could be taken away by a forklift. Filing 99-5 at 19.

Removal of the side sheet panel adjacent to the starter sheet was done in much the same way, except that the side sheet panel was a much larger sheet than the starter sheet panel. While Dorr was cutting around the perimeter of the starter sheet, the plaintiff had been cutting the side sheet panel along its vertical seam, at the bottom, and just underneath the top cord, again leaving two, six-inch sections uncut so that the panel wouldn't fall. The plaintiff then cut two triangle-shaped holes near the top of the side sheet panel

so that the hooks on the chains hanging from the west bay overhead crane hoist could be guided into each openings. Filing 99-2 at 42. After he had lowered the starter sheet to the floor and unhooked it from the crane, Myers raised the crane's hoist back up, and then lowered the two hooks down so that Dorr and the plaintiff could guide them into the triangular openings. Once the hooks were in the openings, Myers raised the crane hoist up to, again, take the slack out of the chains. Filing 99-2 at 45.

This time, however, instead of just taking the slack out of the chains and stopping, the hoist went up higher than Myers had intended to have it go. According to Myers, he took the slack out but "it kept going up, it didn't stop." Filing 99-5 at 21. Dorr described seeing the hoist "jump" or move up faster than it had at any other point of the lift. Filing 99-3 at 17. The plaintiff remembered the hook going into the hole and stopping for a second, and then "all of a sudden, it jumped." Filing 99-2 at 45. With the sheet still partially attached under the top cord and the hooks engaged in the holes, when the crane's hoist moved upward further than Myers wanted, the two, six-inch uncut sections under the top cord acted like hinges and caused the bottom of the sheet to swing out and into the plaintiff's scissor lift, which knocked the lift over and caused the plaintiff to fall to the floor. The plaintiff sustained significant injuries to his lumbar spine which required several surgeries, and left him with significant permanent impairments and disabling conditions.

## III. DISCUSSION

### 1. BREACH OF DUTY

The parties appear to agree that, for the purposes of this motion, at the time of the plaintiff's accident, (1) Myers alone was operating the west bay crane's remote control, (2) the west bay crane's hoist or load block went up further than it should have which put excess tension on the side sheet, and (3)

the excess tension on the side sheet caused it to kick out at the bottom and knock over the plaintiff's scissor lift. From this, the plaintiff asserts that there are only two explanations for why the plaintiff's accident happened: (1) The crane malfunctioned and did not operate the way it should have despite Myers correctly using the remote control; or (2) Myers made a mistake in the operation of the crane. Filing 98 at 34.

The defendant argues that it was not negligent, framing its defense on "five pillars: proper training, proper equipment maintenance, proper crane functioning and operation, an unforeseeable accident." In addition, the defendant also asserts that the accident was caused by the plaintiff's own negligence. Filing 104 at 25. In actuality, the defendant's "five pillars" defense resolves into only one issue: The plaintiff's accident was unforeseeable because in the defendant's workplace, there was proper training, proper equipment maintenance, proper crane functioning, and proper crane operation.[1]

The Federal Employers Liability Act (FELA) imposes upon employers a continuous duty to provide a reasonably safe place to work. *Miller v. Union Pac. R.R. Co.*, 972 F.3d 979, 983 (8th Cir. 2020). Under FELA, the defendant is liable if it, or its agent's negligence played any part, even the slightest part, in producing a plaintiff's injury. *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 691 (2011); *Miller*, 972 F.3d at 984. Whether a harm is reasonably foreseeable is an essential ingredient of a FELA negligence case. *McBride*, 564 U.S. at 704. If there is no reasonable ground to anticipate that a particular condition would or might result in an accident and injury, then there would be no requirement for a party to do anything to correct such condition. *Id.* However, if negligence is proved and shown to have played any part, even the slightest, in producing

---

[1] The defendant's claim regarding the plaintiff's alleged negligence is an affirmative defense, and as such, it is distinct from the issue of whether the defendant breached its duty.

the injury, then the defendant is answerable in damages even if the extent of the injury or the manner in which it occurred was not probable or foreseeable. *Id*. at 703-04.

Whether a railroad has reasonable grounds to foresee that a particular condition might result in an injury is a question of fact and depends on the evidence of each particular case. *Burckhard v. BNSF Ry. Co.*, 837 F.3d 848, 854 (8th Cir. 2016). Neither party has specifically identified the particular condition, or conditions, that, in their view, would or might result in the injury that the plaintiff suffered. The parties' briefing suggest at least three possibilities—all of which could suffice.

First, a particular condition that would or might result in the plaintiff's injury could be the condition of the west bay crane. The plaintiff argues that this crane was widely known to operate erratically at unpredictable times, but the defendant continued to use the west bay crane in daily service. There is considerable evidence supporting the plaintiff's argument. The plaintiff, Dorr, and Myers all testified or reported that when the plaintiff's accident occurred, the crane either jumped, or it kept going up and didn't stop. Filing 99-2 at 45; filing 99-3 at 17; filing 99-5 at 21. Ben Zurcher, Myers' partner, testified that he had operated the west bay crane before the plaintiff's accident and that it doesn't always stop when you release the trigger. Zurcher said the crane "has a mind of its own." Filing 99-4 at 23. Zurcher agreed that the crane continuing to go up when it wasn't supposed to was a safety concern, and that he had brought up his concerns about the crane with a supervisor. Filing 99-3 at 24. Jon Sinner, the plaintiff's supervisor at the time of the accident, said that he experienced the west bay crane moving when it shouldn't, and "everybody was aware of it." Filing 99-19 at 19-20.

In response, the defendant points to evidence that the crane was regularly inspected before the plaintiff's accident, and any problems identified in the inspections were minor, didn't require taking the crane out of service, and had no connection to a claim of erratic or unpredictable crane movement. Further, the plaintiff and Myers agreed that the crane was working fine before the accident. Filing 104 at 26-28.

The railroad has the nondelegable duty to provide its employees with reasonably safe tools and equipment, and whether the railroad used the degree of care that persons of ordinary, reasonable prudence would use in requiring such employees to use the tools and equipment provided is a question of fact. *Ackley v. Chicago & N. W. Transp. Co.,* 820 F.2d 263, 268 (8th Cir. 1987). The evidence referenced above, as well as much more evidence in this record, is highly disputed, which leads to only one conclusion: A jury must determine whether the condition of the west bay crane created an unsafe condition, and whether the defendant could foresee that this particular condition might result in an injury.

The second particular condition that would or might result in the plaintiff's injury could be the competence of the crane operators, and in particular Myers, at the time of the accident. Evidence that the plaintiff relies on concerns the abolishment of designated crane operators three months prior to the plaintiff's accident, and the alleged inadequate training given to the carmen who, like Myers, were required to take over the responsibility of operating the overhead cranes. Designated crane operators had, for the most part, safely operated the overhead cranes at the Havelock facility for years. Those positions were abolished, and evidence suggests that the decision to abolish those positions was entirely economic. Several carmen voiced concerns

that this change created a safety issue, and that someone was going to get hurt. Filing 99-5 at 10.

Further, there is evidence that the carmen who now were required to operate the overhead cranes received substantially less hands-on training with the cranes than what had been provided in the past to the designated crane operators. For example, former designated crane operators said that they received training from an experienced operator for at least a week on each individual crane before being allowed to operate a crane on their own. Filing 99-8 at 3-4. In contrast, Dorr said that his training was "in the neighborhood of an hour" of classroom instruction, a written exam, and operating one crane (out of ten at the Havelock shop) for five minutes at the most. Dorr said that most of what was supposed to be hands-on training actually consisted of standing around and watching others operate two of the cranes that were not being used at that time for production. Filing 99-3 at 9. Myers testified that he had never used the west bay crane to assist in railcar side sheet removal prior to the day of the plaintiff's accident. Filing 99-5 at 26.

The defendant argues that the carmen were properly trained to operate overhead cranes. A training program devised by a crane manufacturer was implemented that incorporated OSHA and ASME standards. Each carman, according to the defendant, received between two and three hours of classroom training and hands-on practice with the cranes in the Havelock shop. Filing 104 at 26. This training, according to the defendant, met or exceeded all industry standards.

The railroad has the nondelegable duty to assign workers to jobs for which they are reasonably suited, and whether such assignment was negligent is a question of fact. *Fletcher v. Union Pac. R. Co.,* 621 F.2d 902, 909 (8th Cir. 1980). Once again, the evidence that the parties point to only demonstrates

fact questions that a jury must resolve. Whether the abolishment of the designated crane operators, and the training the replacing carmen actually received was reasonably adequate so as to not create an unsafe condition, and whether the defendant could foresee that either of these particular conditions might result in an injury, is for a jury to determine.

Finally, the third particular condition that would or might result in the plaintiff's injury could concern the process for removing railcar side sheets. The plaintiff argues that in 2001, during the process of installing a side sheet, the scissor lift that carman Douglas Zavadil was standing on was knocked over when the bottom of the side sheet kicked out. According to the plaintiff, the mechanics of Zavadil's accident were similar to the plaintiff's accident. There, the side panel that Zavadil was installing was rigged to and being raised by the west bay overhead crane, which was being operated by Bob Lacher. Zavadil had positioned his scissor lift in front of and parallel to a side sheet that was being raised into position. While working to fit the side sheet into place, the top of the sheet became impinged against the top cord of the railcar. Lacher didn't, or couldn't, stop the crane's hoist from going up, and the consequence was, with the top of the sheet frozen against the top cord, the bottom of the sheet kicked out and knocked Zavadil's lift over, causing him to suffer an injury. Filing 99-10 at 8-9.

Because of Zavadil's accident, the plaintiff argues that by at least 2001, the defendant had knowledge that side sheets could kick out and cause injury when the crane hoist rigged to the side sheet is raised too high. But despite this knowledge, the defendant made no modification to the procedures for removing side sheets to mitigate against future risks, including where to position a lift. Filing 98 at 41-42. Instead, when the plaintiff was trained in removing side sheet panels, he was instructed to position his scissor lift in front

10

of, and parallel to, the side sheet and railcar. Filing 99-2 at 44-45. He was also trained and instructed to remove side sheet panels by cutting them along the seam, which then dictated the size of the panel being removed. Filing 99-2 at 41. According to the plaintiff, "We always cut them at the seams." Filing 99-2 at 42.

The defendant argues that the plaintiff's accident in the course of removing a side sheet was not reasonably foreseeable. The plaintiff, by his own admission, had removed side sheet panels too many times to count without incident. Filing 104 at 28-29. He believed he knew how to safely remove a side sheet, and agreed that he never told his supervisor, or anyone, that he needed more training in order to learn how to do the job safely. Filing 99-2 at 34. The defendant also argues that Zavadil's 2001 accident, where he was installing a side sheet, was substantially different from the plaintiff's accident, where he was removing a side sheet. Filing 104 at 35. Further, even if Zavadil's accident could be considered similar to the plaintiff's accident, Zavadil's accident was remote in time—occurring nearly twenty years ago—and there were no other similar accidents in the intervening years. As such, the defendant argues, Zavadil's accident is insufficient to give it constructive notice of an unsafe condition.

Additionally, the defendant argues that it could not reasonably foresee that the plaintiff would ignore his training. Filing 104 at 29. In considering whether the defendant breached its duty to provide a reasonably safe place to work, the Court finds this particular argument to be contrary to law. The defendant cannot close its eyes to the conditions that existed in its workplace, and the risks associated with how it knew that the plaintiff was doing his job. The defendant may not merely assume away its nondelegable duty to provide a reasonably safe workplace. *Ackley*, 820 F.2d at 268-69.

11

True, the defendant would have no duty to correct a condition where it had no reasonable ground to anticipate that such condition would, or might, result in an accident and injury. *Burckhard,* 837 F.3d at 854. But here, the defendant makes no claim, and there is no evidence in the record before the Court, that the defendant was unaware, and could not know, how the plaintiff was performing the task of side sheet panel removal. Even assuming, as the defendant argues, that the plaintiff was ignoring some aspect of his training, the defendant isn't free to ignore what the plaintiff was supposedly ignoring. What the defendant is entitled to assume about its employee's behavior bears directly on the question of its own negligence. *Ackley*, 820 F.2d at 268.

The railroad has the nondelegable duty to provide a reasonably safe place to work, and is answerable in damages even if the manner in which an accident and injury occurs is not probable or foreseeable. *Gallick v. Baltimore & O. R. Co.,* 372 US 108, 120 (1963). Once again, the evidence that the parties point to only demonstrates that there are fact questions a jury must resolve. Whether it was reasonably foreseeable that the particular conditions in the task of removing a side sheet might result in an injury is for a jury to determine. The plaintiff's motion for partial summary judgment regarding the defendant's breach of duty will be denied.

## 2. CONTRIBUTORY NEGLIGENCE

In its answer to the plaintiff's complaint, the defendant alleged the affirmative defenses that the plaintiff's negligence was either a contributing cause, or the sole cause, of his accident and injuries. Filing 7 at 4. The plaintiff has moved for judgment as a matter of law on the defendant's affirmative defenses. Filing 100. The Court will grant the plaintiff's motion.

Under FELA, the defendant bears the burden of proving contributory negligence. *Hose v. Chicago Nw. Transp. Co.*, 70 F.3d 968, 978 (8th Cir. 1995). Also under FELA, an employee's contributory negligence shall not bar a recovery for damages, but shall diminish the employee's recovery of damages in proportion to the amount of negligence attributable to such employee, provided that the common carrier's violation of a statute enacted for the safety of employees did not contribute to the employee's injury. 45 U.S.C. § 53.

The defendant argues that the plaintiff was contributorily negligent because there is evidence that he "could have avoided this accident." Filing 103 at 1. According to the defendant, the plaintiff could have positioned his scissor lift to the side of the side sheet panel, or turned it lengthwise to the panel, to prevent the lift from being knocked over when the side sheet kicked out. The plaintiff also could have cut the side sheet into smaller pieces and pushed those pieces into the hopper car to avoid using the crane altogether. Filing 103 at 1-2. Finally, the defendant argues that the plaintiff's "line of fire" training provided him with sufficient knowledge to avoid the accident—training that the defendant asserts the plaintiff ignored. Filing 103 at 18-19.

The problem with the defendant's arguments is that there is no evidence in this record that not cutting the side sheets into smaller pieces, or not positioning the lift to the side, demonstrated the plaintiff's lack of due care. It is reversible error to give a jury instruction on contributory negligence where a defendant fails to produce evidence showing the plaintiff's lack of due care. *Birchem v. Burlington Northern R. Co.*, 812 F.2d 1047, 1049 (8th Cir. 1987).

The defendant relies on testimony from two of its management employees for its claim that the plaintiff was negligent. But the defendant cannot point this Court to anything in this testimony, or the record as a whole, indicating that the manner in which the plaintiff was performing the task of

side sheet removal showed a lack of due care. Ryan Gleason, the defendant's general foreman, who was also designated as the defendant's Rule 30(b)(6) witness authorized to answer for and bind the defendant, admitted that cutting the side sheet panels at the seams, as well as the size of the side sheet panel that the plaintiff cut on the day of his accident, was consistent with the defendant's customary practice for side sheet removal. Filing 99-14 at 71. Gleason also admitted that positioning a scissor lift in front of and parallel to a side sheet panel was the customary routine for the process of side sheet removal. *Id.*

Gleason, at best, said only that he had seen carmen cut side sheets into smaller pieces, and that he had seen carmen position lifts to the side when using a crane to lift a side sheet for removal. Filing 99-14 at 15-16. But Gleason also admitted that the procedure used by the plaintiff and Dorr on the day of the accident to remove the side sheet was the standard way the work was done, that he never said anything to them about being in an unsafe position, and if he had determined that the plaintiff and Dorr were in an unsafe position, he would have said something. Filing 99-14 at 17.

Similarly, Ward Greisen, the defendant's Shop Supervisor, testified that although not a rule, policy, or procedure, some carmen cut the side sheets into smaller pieces, and "some people" were staying off to the side when slack is being removed by the crane. Filing 99-15 at 25-27. But when asked who "some people" were, Greisen had no answer.

Importantly, the plaintiff, Dorr, Zurcher, and Myers all said that the procedure the plaintiff and Dorr used to remove the side sheet panel on the day of the accident was the customary way it was done, and consistent with their training. Filing 99-2 at 24, 41-42, 44-45, 48, 65; filing 99-3 at 24; filing 99-4 at 25-26, 30, 35; filing 99-5 at 14, 26. Further, Jon Sinner, the plaintiff's

supervisor, said that he never observed the plaintiff performing any work practice that was contrary to the defendant's accepted work practices. Filing 99-19 at 9. Sinner also said that on the day of the plaintiff's accident, he was present, walking up and down the middle isle on the bay track, and he observed the plaintiff and Dorr performing the task of side sheet removal. Sinner said that he did not observe any unsafe work practice, and did not tell the plaintiff or Dorr that they needed to perform their work a different way. Filing 99-19 at 25.

The defendant has not identified any evidence showing that the plaintiff violated any rule, policy, or procedure in removing the side sheet panel on the day of his accident, or at any other time. The defendant does, however, assert and argue that the plaintiff ignored his line-of-fire training, but doesn't indicate that this training was part of a rule, policy, or procedure. Nonetheless, the evidence the defendant cites in support of its argument tells a different story. According to the defendant, the plaintiff's line-of-fire training included instruction in how to identify and protect against the dangers inherent with the release of stored energy, and the unanticipated movement of equipment. Filing 103 at 19. However, the plaintiff testified that his line-of-fire training included instruction on how to identify and avoid the dangers inherent with stored energy. He did not mention that his training included anything about unanticipated movement of equipment.

According to the plaintiff, in his training he learned that energy could be stored in dented or crumpled panels on a wrecked railcar. As such, it was necessary to carefully assess where to cut so that a dented panel with stored energy didn't kick out. Filing 99-2 at 7-8, 41. But here, the plaintiff said that there wasn't stored energy, and no line-of-fire risk with the side sheet the plaintiff and Dorr were removing, because the plaintiff had cut all around the

perimeter of the sheet except for the two six-inch sections still attached under the top cord. Filing 99-2 at 7, 41-42, 45. This was not a case of stored energy, but a case where energy was supplied when the crane did not stop going up. Filing 99-2 at 41-42.

The plaintiff's description of line-of-fire training was echoed by Sinner. When he was asked what line-of-fire meant, he said, "It's stored energy when it releases and you don't want to be in the line of fire." Filing 99-19 at 33-34. Sinner said nothing about the addition of energy supplied by the unanticipated movement of equipment. Contrary to the defendant's assertion, the plaintiff did not say, or even imply, that line-of-fire training included instruction on the unanticipated movement of equipment. Instead, he made it clear that what happened to him on June 11 was not an example of the release of stored energy and not part of his line-of-fire training.

Within the context of FELA, contributory negligence is a careless act or omission on a plaintiff's part which tends to add new dangers to conditions that the employer negligently created or permitted to exist. Birchem, 812 F.2d at 1049. The evidence in this record does not support a finding that the plaintiff added a new danger to conditions that the defendant either created or permitted to exist. It is uncontroverted that the position of the lift and the size of the side sheet panel the plaintiff and Dorr were removing was consistent with the work procedures approved by the defendant's management, and consistent with the plaintiff's training, as well as the training given to Dorr and the other carmen.

The plaintiff doesn't dispute that he could have positioned his lift differently to avoid getting hit if a panel "hinged out." Filing 99-2 at 44. But the mere existence of an alternate safer method alone does not establish negligence under FELA. Miller, 972 F.3d at 988. In *Wilson v. Burlington N.,*

*Inc.*, the plaintiff injured his back helping three others carry a large pan that needed to be installed under a hopper car. 670 F.2d 780, 781 (8th Cir. 1982). The year before the plaintiff's injury, the pans were installed using a mechanical jack, but that practice had ended, and the plaintiff was under the impression that now, jacks could not be used to install pans. *Id.*

On appeal, the defendant argued that the decision to lift the pan without a jack or additional help was a matter of the employee's choice, and it was not error to instruct the jury on such plaintiff's contributory negligence. The Court of Appeals disagreed. At the time of the accident pans were always manually installed, and as such, the plaintiff was simply doing his job as the railroad fully expected him to do. *Id.* at 783. Therefore, there was no evidence that the plaintiff's own negligence contributed to his injury, and it would be error to submit the issue of contributory negligence to the jury. *Id.* at 784.

Here, it is undisputed that the plaintiff was simply doing his job the way he had been trained, and in a manner that the defendant had accepted and permitted to exist. On this record, it would be clear error for this Court to submit the issue of the plaintiff's negligence to a jury. *Birchem,* 812 F.2d at 1049; *Wilson,* 670 F.2d at 784. The plaintiff's motion for summary judgment regarding the defendant's affirmative defenses of contributory and sole negligence will be granted.

## IV. CONCLUSION

For the reasons cited above, the plaintiff's motion for summary judgment regarding the defendant's breach of duty (filing 97) is denied. The plaintiff's motion for summary judgment regarding the plaintiff's sole or contributory negligence (filing 100) is granted.

17

IT IS ORDERED:

1.  Plaintiff's motion for summary judgment regarding the defendant's breach of duty (filing 97) is denied.

2.  Plaintiff's motion for summary judgment regarding the defendant's affirmative defenses of the plaintiff's sole and contributory negligence (filing 100) is granted.

3.  The defendant's sole and contributory negligence affirmative defense is dismissed.

Dated this 13th day of May, 2022.

BY THE COURT:

John M. Gerrard
United States District Judge

18